IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DARRIN WAYNE HUNT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 17-cv-00069-JPG-CJP |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant.[1] ) | |

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Darrin Hunt seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in April 2011, alleging a disability beginning April 15, 2010. (Tr. 18.) After holding an evidentiary hearing, Administrative Law Judge (ALJ) William E. Sampson denied plaintiff's claim in 2012. (Tr. 18-30.) The Appeals Council denied review of the decision, plaintiff appealed to this Court, and the ALJ's decision was reversed and remanded. (Tr. 830-48.) ALJ Sampson held a subsequent evidentiary hearing in 2016 and issued another unfavorable decision. (Tr. 725-764; 696-724.) Plaintiff exhausted his administrative remedies and filed a timely complaint with this Court. (Doc. 1.)

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017). She is automatically substituted as defendant in this case. *See* FED. R. CIV. P. 25(d); 42 U.S.C. §405(g).

1

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that the Commissioner made no mistakes of law. This scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether the ALJ made any errors of law. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v.*

*Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence: "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). While judicial review is deferential, however, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

**The Decision of the ALJ**

ALJ Sampson followed the five-step analytical framework set forth above. He determined plaintiff last met the insured status requirement on September 30, 2015 and had not engaged in substantial gainful activity since the alleged onset date. (Tr. 701.) The ALJ found plaintiff had severe impairments of post laminectomy syndrome and coronary artery disease (CAD). (Tr. 701.) ALJ Sampson determined plaintiff had the RFC to perform light work with additional limitations, which precluded him from performing any past relevant work. (Tr. 705-14.) He found, however, that plaintiff was not disabled because he could perform other jobs that existed in the economy. (Tr. 715-16.)

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff Darrin Hunt is a 46-year-old male. In his initial disability report from 2011, plaintiff alleged lumbar radiculitis, radiculopathy lumbosacral, chronic lower back pain, weakness in the lower extremities, and surgery on the L4/5-S limited his ability to work. He was prescribed Cymbalta, Methadone, Prednisone, Tizanidine, and Zolpidem. (Tr. 146.) In the latest function report, plaintiff stated he spent half of the day lying down or reclining to relieve pain and fatigue. On a typical day, he took his medications, woke his children for school, showered, checked the mail, watched television, read a book, and made a bowl of cereal, Poptarts, and/or a sandwich. He could occasionally fold laundry while sitting down or put clothes in the washer and dryer. He needed someone to bring him the clothesbasket to avoid lifting and bending at the waist. He did not do house or yard work because they induced pain. Plaintiff could drive, albeit limitedly. His wife shopped while he leaned on the cart for support. His conditions made it difficult to handle money because he had trouble staying on task. Plaintiff regularly went to his mother's house, the grocery store, and Wal-Mart. He could walk about half a block at a slow pace before he needed to rest for a few minutes. (Tr. 1014-21.)

**2. Evidentiary Hearing**

On remand, ALJ Sampson presided over an evidentiary hearing, which took place on May 11, 2016. (Tr. 725-64.) Plaintiff's attorney stated plaintiff was incapable of sustaining sedentary work due to failed back syndrome (FBS). Plaintiff spent up to three-quarters of his day laying down or reclining. (Tr. 729-30.)

Plaintiff testified he sometimes experienced pain when he walked slowly. After his back surgery, plaintiff could not sit through an entire movie at the theatre because he had to periodically stand up to stretch. (Tr. 735.) Plaintiff's doctor suggested he avoid sitting for more than thirty minutes at a time, and to sit in a firm chair with a straight back when sitting. Plaintiff

5

stated this "didn't work very good," so he laid in a recliner. He had to frequently change positions. (Tr. 738-39.) Reclining helped manage his pain. (Tr. 742.) Plaintiff had a TENS unit, which he used a couple of times each week for about a half an hour at a time. (Tr. 741-42.) Plaintiff's pain was never "a zero." (Tr. 742.) His medication helped tremendously, although there was room for improvement. (Tr. 743.) On a scale of one to ten, plaintiff's pain level with his medications was a five to six. (Tr. 746-47.) Plaintiff received pain injections every six to eight weeks, which made his pain more bearable. (Tr. 747.) Walking a half a block aggravated plaintiff's pain. (Tr. 747-48.)

A vocational expert (VE) also testified regarding several hypothetical individuals with the same age, education, and work experience as plaintiff who had various functional limitations. The VE opined that a person who had two unscheduled absences per month would not be able to sustain employment. (Tr. 752.)

### 3. Medical Records

The Court summarized a portion of plaintiff's medical records in its previous order. The following is a brief overview of those records, along with additional medical evidence submitted on review.

On April 15, 2010, the alleged onset date, plaintiff underwent a pedicle screw fixation at L5 and S1; a decompressive lumbar laminectomy of L5 with foraminotomy of the L5 and S1 nerve roots; and an L5-S1 discectomy. (Tr. 452-53.) He reported chronic back pain thereafter and underwent physical therapy, transforaminal epidural steroid and trigger point injections, and lumbar epidural lysis of adhesions. His primary care physician prescribed a variety of pain medications, including Fentanyl, Vicodin, Neurontin, Methadone, MS Contin and Flexeril. At a

6

two-year post-operative appointment, plaintiff's doctor reviewed an x-ray, which revealed a broken R S1 pedical screw in the sacrum. (Tr. 647-51.)

Plaintiff presented to the emergency room on March 29, 2013 with complaints of back pain. The provider noted no acute distress, but exceptional tenderness to palpation around the lumbar spine, and tenderness to palpation of plaintiff's left and right paraspinal areas. Plaintiff was unable to flex during range of motion (ROM) testing of his back due to pain. An x-ray of his lumbar spine revealed no congenital bone defects; mild anterior and anterolateral bone spondylosis at the L4-5, L5-S1, and L2-3 lumbar level; and no acute fracture of subluxation. Plaintiff received Dilaudid and was advised to follow up with his surgeon and primary care physician. The hospital prescribed plaintiff hydromorphone and discharged him home. (Tr. 1173-76.)

In April 2013, plaintiff received an MRI of his lumbar spine, which revealed changes of prior L5-S1 posterior fusion and discectomy with no evidence of malalignment; multilevel degenerative changes with circumferential disk bulging and facet hypertrophy; mild L2-L3 and L3-L4 spinal stenosis; and variable foraminal narrowing. (Tr. 1205-06.)

Plaintiff presented to his primary care physician, Dr. David Davis, on a multitude of occasions throughout the relevant period. He consistently reported lower back pain and demonstrated diffuse tenderness of the paraspinal muscles, active range of motion (AROM) due to pain, and a loss of lumbar lordosis.

In January 2011, Dr. Davis completed a medical source statement for plaintiff's insurance company. Dr. Davis indicated plaintiff could never sit, stand, walk, lift, climb/balance, stoop/kneel, crouch/crawl, reach/handle, push/pull; and could occasionally perform fine manipulation. He opined plaintiff was unable to work during that time. (Tr. 412.)

7

In September 2013, plaintiff described a constant, dull ache and sharp, shooting pain when bending over. Dr. Davis prescribed prednisone. (Tr. 1379-80.)

In October 2013, plaintiff presented with complaints of low back pain. Dr. Davis referred him to physical therapy. (Tr. 1381-82.) The following month, in November, plaintiff reported physical therapy was not helping. He demonstrated a normal gait. Dr. Davis refilled plaintiff's MS Contin. (Tr. 1383-84.)

In April 2014, presented to Dr. Davis and described a constant, dull ache, which was relieved with rest, and sharp, shooting pain, which occurred after standing for fifteen minutes. Plaintiff demonstrated a normal gait. Dr. Davis stopped plaintiff's Flexeril and prescribed Zanaflex. He also referred plaintiff to Dr. Ragai Mitry. (Tr. 1189-90.)

Plaintiff received an MRI of his lumbar spine on May 13, 2014, which revealed changes of prior L5-S1 posterior fusion and discectomy with no evidence of malalignment; multilevel degenerative changes with circumferential disk bulging and facet hypertrophy; mild L2-L3 and L3-L4 spinal stenosis; and variable foraminal narrowing. (Tr. 1169-70.)

In June 2014, plaintiff presented to Dr. Davis with complaints of chronic pain and back spasms. Dr. Davis assessed plaintiff with degenerative disc disease, low back syndrome, and radiculopathy. Dr. Davis continued plaintiff Zanaflex, Neurontin, and MS Contin. (Tr. 1219-20.)

In September 2014, Dr. Davis assessed plaintiff with degenerative disc disease, radiculopathy, and low back syndrome. He continued plaintiff's MS Contin and Neurontin. (Tr. 1272-73.)

In December 2014, plaintiff told Dr. Davis he received injections "which did seem to improve his back pain some." (Tr. 1266-67.)

In March 2015, plaintiff reported that his January epidural steroid injections afforded him less than fifty percent improvement. The pain was in his lower back and went into both buttocks and down both legs. He had difficulty walking, bending forward, and with "pretty much most activities." Dr. Mitry observed that plaintiff walked with a wide based gait and slight limp and assessed plaintiff with post lumbar laminectomy, lumbar radiculopathy, and myofascial pain. On physical examination, plaintiff demonstrated exacerbated pain with heel and toe walking, forward flexion, and extension. Dr. Mitry encouraged plaintiff to partake in some kind of physical activity (Tr. 1447-48.)

Plaintiff also presented to Dr. Davis in March 2015 with complaints of lower back pain. Plaintiff reported he received an injection eight weeks prior, but because he did not experience fifty percent relief, the doctor had to try another type of injection. He walked with a noticeable limp and was able to bear weight, with pain. Dr. Davis continued plaintiff's current therapy. (Tr. 1345-46.)

In June 2015, plaintiff reported to Dr. Mitry that his lysis of adhesion did not help as well as the prior transforaminal epidural steroid injections did. On physical examination, plaintiff walked slowly but did not limp. He had multiple areas of tenderness and trigger points in the lower back. Dr. Mitry planned to resume bilateral transforaminal epidural steroid and trigger point injections. (Tr. 1451.)

In July 2015, Dr. Davis assessed plaintiff with lumbosacral neuritis NOS, for which he prescribed prednisone. (Tr. 1353-54.) In October 2015, Dr. Davis noted plaintiff was walking with a noticeable limp and was able to weight bear, with pain. He refilled plaintiff's prescription for MS Contin. (Tr. 1359-60.)

In September 2015, Dr. Mitry reported that plaintiff obtained greater than fifty percent improvement from his injections for at least three weeks, before the pain slowly returned. He walked with an almost normal gait. Palpation of the lower back revealed a fair amount of tenderness, bilaterally, and a few trigger points. (Tr. 1456.) In December 2015, plaintiff reported he experienced fifty percent improvement for close to six weeks. (Tr. 1457.)

### 4. Treatment at Union Hospital

Plaintiff attended numerous post-operative appointments at Union Hospital Neuroscience, where he was seen primarily by Dr. Narotam and nurse practitioner, Regina Battles.

Two weeks following his surgery, in April 2010, plaintiff reported no leg pain, numbness, or tingling. He had slight back pain; his motor strength was 5/5 bilaterally; he had no sensory deficits; and his gait was upright and steady. (Tr. 520.)

Six weeks following surgery, in May 2010, plaintiff reported he had pain across his lower back, but was walking three to four blocks in the evenings and around the house during the day. He was also sitting "a lot." Plaintiff's diagnoses included mild myofascial pain. (Tr. 529-30.) On May 27, 2010, plaintiff's nurse practitioner form Union Hospital opined plaintiff could not return to work until, at least, July 19, 2010. (Tr. 536.)

At plaintiff's ninety-day checkup, in July 2010, he demonstrated a steady gait but was stiff and slow when he got up from a chair. He reported back pain. Plaintiff had normal motor strength and sensation. An x-ray revealed intact spinal hardware, no instability, and good fusion. His work status was "Not fit for duty." (Tr. 543-44.)

On July 19, 2010, plaintiff's nurse practitioner opined he was unable to return to work. (Tr. 550.) On July 27, 2010, plaintiff received trigger point injections. (Tr. 549.) On July 28,

10

2010, plaintiff's provider opined he was "not fit for duty," due to his lumbar fusion and myofascial pain. (Tr. 551.)

Plaintiff's nurse practitioner again opined on October 20, 2010 that plaintiff was unable to return to work until his follow-up evaluation in April 2011. Plaintiff complained of constant lower back pain but denied numbness and tingling. He demonstrated a steady gait with no limp. He continued to smoke "despite being informed of its deleterious effect on his fusion and on worsening spine pathology." He had no leg pain or claudication. An x-ray revealed spinal hardware in good position, no instability, and an incomplete fusion mass. (Tr. 561-62.)

At his one-year follow-up, in May 2011, plaintiff had a normal, steady gait and upright posture. He demonstrated paraspinal tenderness, a normal straight leg raise, and no motor deficits. His Oswestry score was 60. Images revealed spinal hardware in good position, no instability, no nerve root compression or stenosis, L4/5 far lateral disc herniation, and no active root compression. His diagnoses were mechanical lower back pain and post-laminectomy syndrome. Plaintiff's provider noted, "Patient non compliant with medical recommendations. He continues to smoke despite being informed on the effects of smoking on spinal fusion and pain tolerance." Plaintiff was discharged to his primary care physician. (Tr. 570-72.)

In May 2012, plaintiff attended a two-year post-operative appointment during which he complained of lower back pain. He had a normal gait with paraspinal tenderness and a straight leg raise limited to 70/70. Dr. Narotam noted that plaintiff displayed symptom exaggeration behavior. His Oswestry score was 56. An x-ray revealed a broken R S1 pedical screw in the sacrum. Dr. Narotam opined plaintiff could return to work with light duty 15-20 pound lifting restriction. (Tr. 647-51.) In March 2012, plaintiff demonstrated generalized weakness, bilaterally. (Tr. 652.)

5. **RFC Assessments**

On May 25, 2011, state-agency consultant Dr. Michael Nenaber opined that plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push and/or pull an unlimited amount. Moreover, plaintiff could frequently climb ramps and stairs, balance, kneel, and crawl. He could occasionally stoop and crouch. Plaintiff could never climb ladders, ropes, or scaffolds. Dr. Nenaber opined plaintiff did have "MDI" that would reasonably be expected to produce his pain. The intensity, persistence, and functionally limiting effects of plaintiff's symptoms were substantiated by the objective medical evidence and plaintiff was credible. (Tr. 579-85.)

On July 27, 2011, state-agency consultant Dr. Sumanta Mitra performed an RFC assessment of plaintiff. Plaintiff ambulated independently with an antalgic gait. Flexion of the lumbar spine was limited to thirty degrees and a slight leg raise was positive at forty-five degrees on the right and thirty degrees on the left. He noted that plaintiff's allegations regarding his limitations seemed excessive compared to objective findings, and that plaintiff was partially credible. (Tr. 636-38.)

Chet E. Clodfelter, a physical therapist, completed a Physical Work Performance Evaluation on April 10, 2012. He opined plaintiff was able to sustain work at the light level for a forty-hour workweek, but could never "work bent over – standing/stooping," and could only occasionally stand, kneel, climb stairs, and repetitively squat. (Tr. 686-95.)

Dr. Vital Chapa evaluated plaintiff on August 12, 2014. He noted no acute distress and physical examination revealed knee and ankle reflexes at 1+; a normal sensory examination;

complaints of back pain on flexion of the lumbar spine at thirty degrees; a positive straight leg raising test at seventy degrees, bilaterally; and no muscle atrophy. (Tr. 1226-28.)

Dr. Davis completed an RFC assessment of plaintiff on September 3, 2014. He listed diagnoses of lumbago; degenerative disc disease; and radiculitis. His objective findings consisted of "limited AROM of L-5 spine." Dr. Davis opined plaintiff's pain would not require him to take breaks totaling more than an hour over the course of an eight-hour workday. Plaintiff's impairments or treatments would cause him to be absent from work about twice per month. (Tr. 1293-95.)

On April 30, 2015, Dr. Davis completed an RFC assessment and determined plaintiff had lumbar radiculopathy and coronary artery disease. He indicated plaintiff should avoid concentrated exposure to extreme heat and cold, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation, and avoid all exposure to hazards. He did not indicate that plaintiff's pain would require him to take extra breaks throughout the workday. (Tr. 1422-24). He completed another RFC assessment in August 2015 and adopted the same environmental restrictions as the previous assessment. In addition, Dr. Davis found plaintiff's pain and/or fatigue would require him to take breaks that totaled an hour or more in an eight-hour workday. Moreover, plaintiff's impairments would cause him to be absent more than three times each month. (Tr. 1426-29.)

In August 2016, Dr. Peter Schosheim completed a Medical Interrogatory Physical Impairment(s) questionnaire. Dr. Schosheim did not personally examine plaintiff. He opined plaintiff had chronic lower back pain and CAD, and determined plaintiff could occasionally lift and/or carry up to ten pounds; could stand for twenty minutes and sit for two hours without interruption. In total, plaintiff could sit for six hours, stand for one hour, and walk for one hour in an eight-hour workday. Plaintiff could frequently reach, handle, finger, feel, and push/pull

with both hands. He could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. He could never climb ladders or scaffolds. He could never be exposed to unprotected height, moving mechanical parts, or vibrations. He could occasionally operate a motor vehicle. Plaintiff could frequently be exposed to humidity and wetness, dust, odors, fumes, and pulmonary irritants, and extreme heat and cold. Plaintiff could shop, travel without a companion, ambulate without an assistive device, use standard public transportation, climb a few steps at a reasonable pace, prepare a simple meal and feed himself, care for his personal hygiene, and sort, handle, or use paper. He could not walk a block at a reasonable pace on rough or uneven surfaces. (Tr. 1533-41.)

### 6. Independent Medical Evaluation

Plaintiff underwent an Independent Medical Evaluation on February 14, 2012 and received a primary diagnosis of failed low back syndrome with chronic right L5 radiculopathy. Dr. David Fletcher, who is board-certified in Occupational and Preventative Medicine, found no evidence of overt symptom magnification. Dr. Fletcher opined plaintiff should not lift anymore than ten pounds, should not engage in repetitive waist bending, and needed to be able to alternate from the sit to stand position at will. Plaintiff demonstrated an antalgic gait with decreased weight bearing on the right lower extremity. Tenderness was present in the low back area. He believed plaintiff's motor deficit supported his alleged functional and daily activity level. Dr. Fletcher opined plaintiff could work twenty to thirty hours per week and build up to forty-hour workweeks. He suggested plaintiff return to work "in some capacity," which "is one of the most important parts of therapy." He also noted plaintiff should quit smoking because it is associated with increased low back pain. (Tr. 670-85.)

## Analysis

Plaintiff attacks the disability determination on several bases. He first argues the ALJ misconstrued medical evidence, either by cherry-picking portions of records or misstating facts.

On July 28, 2010, Dr. Narotam's office completed a form indicating plaintiff was "not fit for duty." (Tr. 551.) The ALJ rejected the opinion, stating it was authored by a nurse practitioner and appeared to be based on plaintiff's subjective claims. (Tr. 707.) This analysis is flawed.

Although the signature on the form is illegible, there is no indication it was authored by a nurse practitioner. Moreover, Dr. Narotam indicated plaintiff was "not fit for duty" earlier that month, during a follow-up appointment. (Tr. 544.) The ALJ also dismissed the opinion because "this non-approved source appeared to have based this assessment on the claimant's subjective claims. . . ." (Tr. 707.) Plaintiff's diagnoses included myofascial pain syndrome, which "is a chronic pain disorder," where "pressure on sensitive points in your muscles (trigger points) causes pain in seemingly unrelated parts of your body." MAYO CLINIC, *Myofascial Pain Syndrome*, http://www.mayoclinic.org/diseases-conditions/myofascial-pain- syndrome/basics/ definition/con-20033195 (last visited October 10, 2017). Myofascial pain syndrome is a condition similar to fibromyalgia. *See Alexander v. Barnhart*, 287 F. Supp. 2d 944, 965 (E.D. Wis. 2003), and sources cited therein. The Seventh Circuit has held it is improper for an ALJ to discredit a doctor's opinion regarding fibromyalgia because it rests on reports of pain. *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017). Moreover, plaintiff had trigger points, which the Seventh Circuit has suggested are objective evidence. *Id.* ("[F]ibromyalgia . . . cannot be measured with objective tests aside from a trigger-point assessment."); *Weitzenkamp v. Unum Life Ins. Co. of America*, 661 F.3d 323, 331 (7th Cir. 2011) ("We have recognized that the trigger test can more or less objectively establish [fibromyalgia]. . . .").

The ALJ also made several errors in discounting Dr. Davis's opinions. ALJ Sampson opined Dr. Davis's opinions were inconsistent with other medical opinions in the record, including Dr. Fletcher's. The ALJ wrote, "Overall, Dr. Fletcher found the claimant deconditioned but capable of a sustained 40-hour workweek . . . ." (Tr. 709.) However, Dr. Fletcher opined plaintiff could work twenty to thirty hours per week and that plaintiff was "deconditioned and need[ed] to *build up* to a 40 hour work week." (Tr. 672) (emphasis added). This sort of "sound-bite" approach to record evaluation is impermissible. *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014).

The ALJ also failed to recognize Dr. Fletcher's opinion that plaintiff's subjective complaints correlated with the objective findings. (Tr. 672.) The ALJ further ignored Dr. Fletcher's opinion that plaintiff could lift no more than ten pounds, perform no repetitive waist bending, and must be able to alternate from the sit to stand position at will. (Tr. 671.) Although an ALJ need not mention every piece of evidence, "he cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Notably, the ALJ afforded "some deference" to Dr. Fletcher's opinion, but not "greater deference," because it was "a very early opinion such that the clinician lacked access to the complete record." (Tr. 710.) This statement also appears misplaced, as Dr. Fletcher's opinion is from March 2012, which is approximately two years after the alleged onset date. In addition, the ALJ gave "greater deference" to Mr. Clodfeter's assessment, which is dated just a month later, in April 2012. (Tr. 710, 686-95.)

The ALJ also opined that Dr. Davis's reports were inconsistent with Dr. Mitry's reports. Dr. Davis noted plaintiff appeared uncomfortable during an examination in 2011. The ALJ

16

stated, "Dr. Mitry noted no such behavior, telling the claimant he needed to increase his exertional activities." The ALJ concluded, "[O]ne cannot ignore. . . the noted absence of pain by other clinicians aside from Dr. Davis." (Tr. 709.)

The ALJ failed to build the logical bridge between the evidence and this conclusion. First, Dr. Mitry encouraged plaintiff to partake in physical activity in November 2009, and again in March 2015. (Tr. 588, 1447.) The 2009 opinion predates plaintiff's surgery and onset date, and the 2015 opinion was rendered about four years after Dr. Davis's. In addition, contrary to the ALJ's assertion, Dr. Mitry noted pain during both of these examinations. In November 2009, Dr. Mitry conducted a physical examination that revealed plaintiff was in moderate discomfort, walked with a slight limp, and experienced exacerbated pain during flexion and heel walking. (Tr. 587-88.) In 2015, Dr. Mitry wrote plaintiff walked with a noticeable limp and experienced pain with flexion, extension, and heel and toe walking. (Tr. 1447.)

The Commissioner urges the Court not to "nitpick" the ALJ's decision. An agency's opinion is subject to harmless error review, which means an ALJ's errors will not warrant remand "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record. . . ." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Here, however, the cumulative mistakes make it impossible to determine whether the ALJ's weighing of the medical evidence was supported by substantial evidence. The fact that an ALJ "might have" reached the same conclusion does not make his errors harmless, because the Court cannot engage in such speculation. *Id.* Remand is therefore required on this point, alone, and plaintiff's remaining arguments will not be addressed.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE:  October 20, 2017**

**s/ *J. Phil Gilbert***
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**